Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                                   Docket No.: _____(      )

                              Plaintiffs,

                                                          **Plaintiffs Demand a**
          -against-                                       **Trial by Jury**

EZ ORTHO SUPPLY, INC., ELNAR ZARBAIL,
and JOHN DOE DEFENDANTS "1" through "10",

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs") as and for their Complaint against Defendants, EZ Ortho Supply, Inc., Elnar Zarbail,

and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as

follows:

## NATURE OF THE ACTION

1.     GEICO brings this action to terminate a fraudulent scheme perpetrated by the

Defendants who exploited the New York "No-Fault" insurance system by billing GEICO more than $1.1 million for purportedly dispensing medical equipment and orthotic devices to individuals involved in automobile accidents in a systematic, predetermined fashion, without regard for genuine patient care.  As part of the fraudulent scheme, the Defendants engaged in collusive arrangements to steer large volumes of prescriptions for the medically unnecessary equipment and orthotics to EZ Ortho Supply Inc. ("EZ Ortho") in exchange for unlawful kickbacks and other financial incentives.

2.    Defendants EZ Ortho and its record owner, Elnar Zarbail ("Zarbail"), submitted, or caused to be submitted, hundreds of fraudulent no-fault insurance charges to GEICO relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical traction equipment, lumbar sacral supports, etc.) (collectively, the "Fraudulent Equipment").  Zarbail effectuated the scheme to submit large volumes of billing to GEICO and other New York automobile insurance companies for the Fraudulent Equipment by colluding with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics") and various physicians and other healthcare providers (the "Referring Providers") that prescribed DME and OD to the Insureds treating at the Clinics.

3.    Based upon purported prescriptions for Fraudulent Equipment allegedly issued by the Referring Providers and steered to Zarbail and EZ Ortho (collectively, the "DME Defendants"), the DME Defendants purported to provide Fraudulent Equipment to individuals who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies (the "Insureds").  To the extent that any Fraudulent Equipment was actually provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the DME Defendants

misrepresented the type and nature of the Fraudulent Equipment in order to inflate the charges and maximize the Defendants' ill-gotten gains.

4.    By this action, GEICO seeks to recover more than $254,000.00 that has been wrongfully obtained by the DME Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $450,000.00 in pending no-fault insurance claims that have been submitted through EZ Ortho because:

(i)    The DME Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements;

(ii)   The DME Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed – to the extent that any Fraudulent Equipment was dispensed – pursuant to prescriptions purportedly issued by the Referring Providers as a result of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and

(iii)  To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the DME Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds.

5.    The Defendants fall into the following categories:

(i)    Defendant EZ Ortho is a New York corporation that purports to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bills New York automobile insurance companies, including GEICO.

(ii)   Defendant Zarbail owns, operates, and controls EZ Ortho and uses it to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)  John Doe Defendants "1" – "10" ("John Doe Defendants") include individuals who are presently not identifiable but who (a) are associated

with the Clinics, including Clinic Controllers, who are not licensed healthcare professionals but who illegally own and control the Clinics, (b) are able to provide prescriptions to the DME Defendants in exchange for unlawful payments and (c) who have conspired with Zarbail and EZ Ortho to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6.     As discussed below, the Defendants at all times have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the Fraudulent Equipment was prescribed and dispensed pursuant to fraudulent pre-determined protocols without regard to medical necessity; (ii) the prescriptions directed to EZ Ortho were the byproducts of unlawful financial and kickback arrangements, and thus, EZ Ortho was not eligible for no-fault insurance reimbursement in the first instance; and (iii) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws.

7.     As such, the DME Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through EZ Ortho.

8.     The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the DME Defendants submitted, or caused to be submitted, to GEICO under the name of EZ Ortho.

9.     Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has continued uninterrupted through the present day, as the DME Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $254,000.00

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity

Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    **Defendants**

11.    Defendant EZ Ortho is a New York corporation that was incorporated on or about September 19, 2019 and has its principal place of business in Kings County, New York.  At all relevant times, EZ Ortho has been owned and operated by Zarbail, and has been used by Zarbail as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

12.    Defendant Zarbail resides in and is a citizen of New York, and, at all relevant times, has owned and operated EZ Ortho.

13.    Zarbail is not and has never been a licensed healthcare provider, and entered into unlawful arrangements with the John Doe Defendants, including the Clinic Controllers, and others who are not presently identifiable in exchange for referrals to EZ Ortho for the Fraudulent Equipment.

14.    Upon information and belief, John Doe Defendants "1" – "10" are citizens of New York and include the Clinic Controllers who are not presently identifiable but are associated with the Clinics, who are not licensed healthcare professionals but who illegally own and control the Clinics, and who have conspired with EZ Ortho and Zarbail to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interest and costs, and is between citizens of different states.

16.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

17.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

19.    GEICO underwrites automobile insurance in the State of New York.

I.    **An Overview of the Pertinent Laws**

A.    **Pertinent Laws Governing No-Fault Insurance Reimbursement**

20.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

21.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD.  See N.Y. Ins. Law § 5102(a).

23.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

24.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

26.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD.  See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

27.     Prohibited kickbacks include more than payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party." See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

28.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound

by ethical rules that govern the quality of care delivered by a physician to a patient."

29.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

30.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

31.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

32.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and all other automobile insurers, must be verified by the healthcare service provider, subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

33.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed

healthcare provider. <u>See</u> N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

34.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), and whirlpool baths.

35.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (<u>i.e.</u>, "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

36.    To ensure that Insureds' $50,000.00 in minimum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

37.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

38.    As it relates to DME and OD, prior to 2022, the New York Fee Schedule set forth the maximum charges as follows:

(a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices]…shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided…if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1)    the acquisition cost (i.e., the line-item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%; or

(2)    the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

39.    As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

40.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

41.    For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items.  The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

42.    The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.

43.    Where a specific piece of DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer, such as GEICO, to the provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u> (ii) the usual and customary price charged to the general public.

44.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." <u>See</u> New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

45.    To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

46.    Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted, and/or customized.  Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, <u>Correct Coding – Definitions Used for Off-the Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised</u>.  As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

47.    In an effort to reduce instances of fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the old New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New

York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

48.     Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges.  The charges for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

49.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

50.     However, between the time period of April 4, 2022 and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

51.     For all charges after April 4, 2022, as it relates to Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.  See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

52.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

> (i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is

licensed to issue such prescriptions;

(ii)     The prescription for DME or OD is not based on any unlawful financial arrangement;

(iii)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)     The fee sought for the DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item.

## III.    **The Defendants' Fraudulent Scheme**

### A.    **Overview of the Defendants' Fraudulent Scheme**

53.    Beginning in 2019, the Defendants devised and implemented a complex fraudulent scheme in which EZ Ortho was used as a vehicle to bill GEICO and other New York automobile insurers hundreds of thousands of dollars in No-Fault Benefits to which they were never entitled to receive.

54.    To date, the DME Defendants have wrongfully obtained more than $254,000.00 from GEICO, and there is more than $450,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the DME Defendants continue to seek payment of from GEICO.

55.    Zarbail used EZ Ortho to directly obtain No-Fault benefits and maximize the amount of No-Fault benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for fee schedule and non fee schedule items.

56.    The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of agreements with third-party individuals who are not presently

identifiable.

57.    Upon information and belief, in exchange for various forms of consideration from the Defendants, the Referring Providers treating Insureds at specific Clinics purportedly issued prescriptions for Fraudulent Equipment to virtually every Insured, and many of those prescriptions were provided to the Defendants in exchange for various forms of consideration that the Defendants provided to others who are not presently identifiable.

58.    The prescriptions obtained by the DME Defendants for DME and OD were virtually never given to the Insureds, but as part of the scheme, they were routed directly to the DME Defendants from the John Doe Defendants, including the Clinic Controllers, to ensure that the Insureds did not fill the prescriptions with legitimate DME and OD retailers.

59.    The prescriptions obtained by the DME Defendants for DME and OD included prescriptions for Fee Schedule items which the DME Defendants used to (i) misrepresent the nature and quality of the items intended by the prescriptions; and (ii) misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like GEICO.

60.    As part of the scheme, the John Doe Defendants, including the Clinic Controllers, directed that the prescriptions issued by the Referring Providers should often be written for a version of DME and/or OD that had a high – if not one of the highest – maximum reimbursement rates under the DME Fee Schedule, which permitted the Defendants to charge up to 10 times their acquisition cost.

61.    By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Defendants indicated that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item

was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

62.    However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the DME Defendants.

63.    Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, the DME Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the DME Defendants.

64.    The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by the DME Defendants.

65.    The DME Defendants, by purchasing inexpensive and poor-quality Fraudulent Equipment, which they used to fill the generic and vague prescriptions provided by the Clinic Controllers and Referring Providers, executed a scheme to bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; and (ii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO.

**B.    The Defendants' Illegal Financial Arrangements**

66.     In order to obtain access to Insureds so that the DME Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the DME Defendants could obtain from GEICO and other New York automobile insurers, the DME Defendants entered into collusive agreements with the Clinic Controllers in order to direct vague

and generic prescriptions for medically unnecessary Fraudulent Equipment to EZ Ortho.

67.     Since EZ Ortho's inception, the DME Defendants engaged in unlawful financial arrangements with the John Doe Defendants, including paying kickbacks in exchange for obtaining prescriptions for Fraudulent Equipment that could be dispensed by EZ Ortho.  The unlawful financial arrangements allowed the DME Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers.

68.     As part of the unlawful financial arrangements, the Defendants paid thousands of dollars in kickbacks to others, many of whom are not presently identifiable in order to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

69.     The Fraudulent Equipment was prescribed pursuant to predetermined protocols established at the Clinics, all of which almost exclusively treated No-Fault patients.

70.     These Clinics included, but were not limited to: (i) 318 Seguine Avenue, Staten Island, New York (the "Seguine Avenue Clinic"); (ii) 3000 Eastchester Road, Bronx, New York (the "Eastchester Road Clinic"); (iii) 1601-1525 Gravesend Neck Road, Brooklyn, New York (the "Gravesend Neck Road Clinic"); (iv) 1115 Ocean Parkway, Brooklyn, New York (the "Ocean Parkway Clinic"); (v) 1440 Forest Avenue, #8, Staten Island, New York (the "Forest Avenue Clinic"); (vi) 1900 B Ralph Avenue, Brooklyn, NY (the "Ralph Avenue Clinic"); and (vii) 780 Eighth Avenue, #201, New York, New York (the "Eighth Avenue Clinic").

71.     Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

72.     In fact, GEICO has received billing from many of the Clinics from an ever-

changing number of healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name, beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

73.    For example, GEICO has received billing for purported healthcare services rendered at the Seguine Avenue clinic from a "revolving door" of over 100 different healthcare providers.

74.    Similarly, GEICO has received billing for purported healthcare services rendered at the Forest Avenue Clinic from a "revolving door" of approximately 60 different healthcare providers.

75.    Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care.

76.    Pursuant to the unlawful financial arrangements, the DME Defendants would pay kickbacks to the Clinic Controllers or, upon information and belief, to fictitious businesses associated with them, in order to obtain referrals for the Fraudulent Equipment to be provided to motor vehicle accident victims who treated at the Clinics.

77.    In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, including illegal kickbacks, between the DME Defendants and the John Doe Defendants, including the Clinic Controllers, Zarbail never met the Referring Providers who issued the prescriptions that were provided to the DME Defendants.

78.    In keeping with the fact that the Defendants engaged in unlawful financial

arrangements, the DME Defendants obtained prescriptions for Fraudulent Equipment directly from the Clinics, without any communications or involvement by the Insureds.

79.    In keeping with the fact that the prescriptions for Fraudulent Equipment were obtained directly from the Clinics and without any involvement from the Insureds, the prescriptions purportedly issued by the Referring Providers were provided directly to the Clinics' staff who then submitted the prescriptions directly to the DME Defendants.

80.    Moreover, to the extent that the Insureds received any Fraudulent Equipment, the Insureds, at times, were provided with the Fraudulent Equipment directly from the Clinics, without any interaction with the DME Defendants.

81.    Specifically, at times, when EZ Ortho billed GEICO for purportedly providing DME and OD to Insureds who purportedly treated at the Clinics, the Insureds were directed to support staff at the Clinics who would directly provide the DME and OD to the Insureds, without any involvement or interaction by the DME Defendants.

82.    In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent treatment protocols – as explained below.

83.    But for the payment of kickbacks from the DME Defendants, the Clinic Controllers, working with the Referring Providers, would not have had any reason to direct a substantial volume of medically unnecessary prescriptions to EZ Ortho.

84.    Upon information and belief, the payment of kickbacks by the DME Defendants was made at or near the time the prescriptions were issued, but the DME Defendants and the Clinic Controllers and/or the Referring Providers affirmatively concealed the particular amounts paid

since the payment of kickbacks in exchange for patient referrals violates New York law.

85.     As a result of the unlawful financial arrangements, the DME Defendants drastically increased the volume of their billing to GEICO and other New York automobile insurers for Fraudulent Equipment.

**C.     The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

86.     In addition to the unlawful financial arrangements between the DME Defendants and the John Doe Defendants, including the Clinic Controllers, the prescriptions that were provided to the DME Defendants were the result of predetermined fraudulent protocols between and among the DME Defendants, the John Doe Defendants and the Referring Providers.

87.     The predetermined fraudulent protocols were implemented solely to maximize the billing that the DME Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

88.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued upon the fraudulent protocols described below.

89.     In the claims identified in Exhibit "1", virtually all the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

90.     In keeping with the fact that many of the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

91.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek

treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

92.     Despite virtually all of the Insureds being involved in relatively minor and low impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds at each of the Clinics were subject to extremely similar treatment, including substantially identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

93.     In keeping with the fact that the prescriptions were provided as part of predetermined protocols to maximize profits – not based on medical necessity – the Insureds identified in Exhibit "1" who treated with the same Referring Provider routinely received multiple items of Fraudulent Equipment of virtually the same type.

94.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

95.     Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but does not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.  The specific DME and/or OD that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

96.     In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific

DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD.  In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

97.    If a healthcare provider determines that DME and/or OD is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why.

98.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

99.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

100.    It is extremely improbable – to the point of impossibility – that Insureds involved in automobile accidents who treated at a specific Clinic would routinely receive prescriptions for numerous items of Fraudulent Equipment of substantially the same type.

101.    Insureds routinely receiving multiple items of identical Fraudulent Equipment would, by extension, mean Insureds routinely reported to a specific Referring Provider complaining of the exact same symptoms.

102.    It is extremely improbable – to the point of impossibility – that a substantial number of Insureds who treated at different Clinics with different Referring Providers around the New York metropolitan area and were purportedly issued Fraudulent Equipment from EZ Ortho, would

require numerous items of DME or OD of substantially the same type.

103.    Nevertheless, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the Insureds identified in Exhibit "1" were issued virtually identical prescriptions for predetermined Fraudulent Equipment.

104.    In further keeping with the fact that Fraudulent Equipment purportedly provided to the Insureds were medically unnecessary and issued as part of a predetermined fraudulent protocol, the Fraudulent Equipment was purportedly dispensed several weeks after the prescriptions were issued, when comparable equipment was easily and promptly obtainable through online retailers – such as Amazon.

105.    For example:

    (i)    Insured JG was allegedly involved in a motor vehicle accident on October 9, 2021. Thereafter JG sought treatment with Angelo DiMaggio DC ("Dr. DiMaggio") at Touchstone Chiropractic PC ("Touchstone Chiro") at the Seguine Avenue Clinic. On December 20, 2021, EZ Ortho purportedly provided JG with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to an undated prescription purportedly issued by Dr. DiMaggio.

    (ii)    Insured SN was allegedly involved in a motor vehicle accident on November 19, 2021. Thereafter SN sought treatment with Dr. DiMaggio at Touchstone Chiro at the Seguine Avenue Clinic. On February 17, 2022, EZ Ortho purportedly provided SN with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to an undated prescription purportedly issued by Dr. DiMaggio.

    (iii)    Insured PO was allegedly involved in a motor vehicle accident on January 5, 2022. Thereafter PO sought treatment with Dr. DiMaggio at Touchstone Chiro at the Seguine Avenue Clinic. On April 13, 2022, EZ Ortho purportedly provided PO with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to an undated prescription purportedly issued by Dr. DiMaggio.

    (iv)    Insured SP was allegedly involved in a motor vehicle accident on May 22, 2022. Thereafter, SP sought treatment with Leonid Litovskiy PA ("PA Litovskiy") at LR Medical PLLC ("LR Medical") at the Ralph Avenue

Clinic. On August 5, 2022, EZ Ortho purportedly provided SP with an LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to a prescription issued by PA Litovskiy more than a month earlier on June 29, 2022.

(v)     Insured JV was allegedly involved in a motor vehicle accident on May 13, 2022. Thereafter JV sought treatment with George Watson, DC ("Dr. Watson") at Dr. Watson Chiropractic PC (the "Watson PC") at the Eastchester Road Clinic. On August 31, 2022, EZ Ortho purportedly provided JV with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to an undated prescription purportedly issued by Dr. Watson.

(vi)    Insured DD was allegedly involved in a motor vehicle accident on November 17, 2021. Thereafter, DD sought treatment with Arkady Lipnitsky DC ("Dr. Lipnitsky") at the Forest Avenue Clinic. On February 17, 2023, EZ Ortho purportedly provided DD with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to a prescription issued  by Dr. Lipnitsky  more than a month earlier on January 11, 2022.

(vii)   Insured CA was allegedly involved in a motor vehicle accident on June 5, 2023. Thereafter, CA sought treatment with PA Litovskiy at LR Medical at the Ralph Avenue Clinic. On August 25, 2023, EZ Ortho purportedly provided CA with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to a prescription issued by PA Litovskiy more than two weeks earlier on August 11, 2023.

(viii)  Insured OK was allegedly involved in a motor vehicle accident on June 16, 2023. Thereafter, OK sought treatment with Yvette Davidov, DO ("Dr. Davidov") at S&R Medical PC ("S&R Medical")  at the Ocean Parkway Clinic. On September 22, 2023, EZ Ortho purportedly provided OK with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to a prescription issued by Dr. Davidov more than a week earlier on September 11, 2023.

(ix)    Insured TI was allegedly involved in a motor vehicle accident on July 19, 2023. Thereafter, TI sought treatment with Dr. Davidov at S&R Medical at the Ocean Parkway Clinic. On October 27, 2023, EZ Ortho purportedly provided TI with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit billed under HCPCS E0855 pursuant to a prescription issued by Dr. Davidov more than three weeks earlier on October 4, 2023.

(x)     Insured AP was allegedly involved in a motor vehicle accident on July 29, 2023. Thereafter, AP sought treatment with Dr. Davidov at S&R Medical at the Ocean Parkway Clinic. On October 27, 2023, EZ Ortho purportedly provided AP with a custom fitted LSO billed under HCPCS L0631 and a

cervical traction unit billed under HCPCS E0855 pursuant to a prescription issued by Dr. Davidov more than three weeks earlier on October 4, 2023.

106. These are only representative examples.

107. Similarly, and in keeping with the fact that the DME and orthotics dispensed by EZ Ortho were not medically necessary and were prescribed and dispensed pursuant to predetermined protocols to maximize profits, EZ Ortho routinely received prescriptions at or near the initial stage of treatment to dispense an array of substantially identical – if not exactly identical – DME and OD to Insureds involved in the same accident.

108. For example:

(i)     On May 21, 2019, two Insureds – TH and MM – were involved in the same automobile accident.  Thereafter, TH and MM both presented to the same multidisciplinary clinic.  Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction", billed to GEICO under HCPCS Code E0855, and a "Back Brace", billed to GEICO under HCPCS Code L0631, pursuant to virtually identical prescriptions. TH and MM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received, or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(ii)    On July 15, 2019, three Insureds – DA, JA, and MRA – were involved in the same automobile accident.  Thereafter, DA, JA, and MRA all presented to the same multidisciplinary clinic.  Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction", billed to GEICO under HCPCS Code E0855, and a "Back Brace", billed to GEICO under HCPCS Code L0631, pursuant to virtually identical prescriptions. DA, JA, and MRA were different ages, in different physical conditions, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received, or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(iii)   On September 7, 2019 two insureds- GM and TM- were involved in the same accident. Thereafter, GM and TM both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical

Traction", billed to GEICO under HCPCS Code E0855, and a "Back Brace", billed to GEICO under HCPCS Code L0631. GM and TM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received, or purportedly received, identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(iv)    On July 25, 2020, three insureds- MG, KO, and SO- were involved in the same automobile accident. Thereafter, MG, KO, and SO all presented to the same multidisciplinary clinic for treatment. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction", billed to GEICO under HCPCS Code E0855, and a "Back Brace", billed to GEICO under HCPCS Code L0631, pursuant to virtually identical prescriptions. MG, KO, and SO were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received, or purportedly received, virtually identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(v)     On April 21, 2021, three Insureds – DH, RA, and YR – were involved in the same automobile accident. Thereafter, DH, RA, and YR all presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction", billed to GEICO under HCPCS Code E0855, and a "Back Brace", billed to GEICO under HCPCS Code L0631, pursuant to identical prescriptions pursuant to virtually identical prescriptions. DH, RA, and YR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received, or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(vi)    On August 13, 2021 two insureds- JV and AJV- were involved in the same accident. Thereafter, JV and AJV both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction", billed to GEICO under HCPCS Code E0855, and a "Back Brace" billed to GEICO under HCPCS Code L0631. JV and AJV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received, or purportedly received, identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(vii)    On December 28, 2021 two insureds- BG and TY- were involved in the same automobile accident. Thereafter, BG and TY both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction", billed to GEICO under HCPCS Code E0855, a "Back Brace", billed to GEICO under HCPCS Code L0631. BG and TY were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received, or purportedly received, identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(viii)   On February 20, 2022 two insureds- AN and FA- were involved in the same accident.  Thereafter, AN and FA both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction Equipment", billed to GEICO under HCPCS Code E0855, ad a "Lumbar Sacral Orthosis", billed to GEICO under HCPCS Code L0631. AN and FA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received, or purportedly received, identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(ix)     On July 10, 2023, two Insureds – SR and GHC – were involved in the same automobile accident.  Thereafter, SR and GHC both presented to the same multidisciplinary clinic.   Following a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction Equipment", billed to GEICO under HCPCS Code E0855, "Lumbar Sacral Orthosis" billed to GEICO under HCPCS Code L0631, and a "Pillow", billed to GEICO under HCPCS E2611, pursuant to virtually identical prescriptions. SR and GHC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.   To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.   Even so, these Insureds received, or purportedly received, virtually identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

(x)      On August 25, 2023 two insureds- JG and AG- were involved in the same accident.  Thereafter, JG and AG both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed "Cervical Traction Unit", billed to GEICO under HCPCS Code E0855, and a "Back Brace (LSO)", billed to GEICO under HCPCS Code L0631. JG and AG

were different ages, in different physical conditions, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received, or purportedly received, identical prescriptions for Fraudulent Equipment that was dispensed by EZ Ortho.

109.    These are only representative examples.

110.    It is even more improbable – to the point of impossibility – that an overwhelming amount of the Insureds identified in Exhibit "1" who treated at various Clinics would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

111.    In further keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment, and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued on dates that the Insureds never treated with the Referring Providers.

(i)     Insured CP was allegedly involved in a motor vehicle accident on September 15, 2020. Thereafter, CP sought treatment with Touchstone Chiro at the Seguine Avenue Clinic. On December 10, 2020, EZ Ortho purportedly provided CP with cervical traction equipment pursuant to a prescription issued by Dr. DiMaggio on December 4, 2020, when CP never treated with Dr. DiMaggio on December 4, 2020.

(ii)    Insured DJ was allegedly involved in a motor vehicle accident on July 5, 2021. Thereafter, DJ sought treatment with Dr. Watson at the Watson PC at the Eastchester Road Clinic. On December 12, 2021, EZ Ortho purportedly provided DJ with a cervical traction unit and custom fitted LSO pursuant to prescriptions issued by Dr. Watson on November 9, 2021, when DJ never treated with Dr. Watson on November 9, 2021.

(iii)   Insured YP was allegedly involved in a motor vehicle accident on December 23, 2021. Thereafter, YP sought treatment with Anatoliy Abakin, DC ("Dr. Abakin") at Logic Chiropractic PC ("Logic Chiro") at the Forest Avenue Clinic. On April 25, 2022, EZ Ortho purportedly provided YP with a cervical traction unit pursuant to a prescription issued by Dr. Abakin on March 14, 2022, when YP never treated with Dr. Abakin on March 14,

2022.

(iv)     Insured RR was allegedly involved in a motor vehicle accident on April 2, 2022. Thereafter, RR sought treatment with Logic Chiro at a clinic located at the Forest Avenue Clinic. On July 11, 2022, EZ Ortho purportedly provided RR with a custom fitted LSO pursuant to a prescription issued by Dr. Abakin on June 20, 2022, when RR never treated with Dr. Abakin on June 20, 2022.

(v)      Insured HJ was allegedly involved in a motor vehicle accident on October 9, 2022. Thereafter, HJ sought treatment with Pain Physicians NY PLLC ("Pain Physicians") at a clinic located at the Eighth Avenue Clinic. On October 26, 2022, EZ Ortho purportedly provided HJ with a custom fitted LSO and a cervical traction unit pursuant to a prescription issued by Joseph Kim, MD ("Dr. Kim") on December 7, 2022, when HJ never treated with Dr. Kim on December 7, 2022.

(vi)     Insured BT was allegedly involved in a motor vehicle accident on December 15, 2022. Thereafter, BT sought treatment with Dr. DiMaggio at Touchstone Chiro at the Seguine Avenue Clinic. On February 19, 2023, EZ Ortho purportedly provided BT with a custom fitted LSO and a cervical traction unit pursuant to a prescription issued by Dr. DiMaggio on January 24, 2023, when BT never treated with Dr. DiMaggio on January 24, 2023.

(vii)    Insured MG was allegedly involved in a motor vehicle accident on December 29, 2022. Thereafter, MG sought treatment with Triborough PT at the West End Avenue Clinic. On January 16, 2023, EZ Ortho purportedly provided MG with a custom fitted LSO pursuant to a prescription issued by PA Lipnitsky on January 9, 2023, when there is no evidence MG ever treated with PA Lipnitsky on January 9, 2023.

(viii)   Insured FV was allegedly involved in a motor vehicle accident on April 8, 2023. Thereafter FV sought treatment with Unaiza Malik PA ("PA Malik") at the 8th Avenue Clinic. On June 24, 2023, EZ Ortho purportedly provided FV with a custom fitted LSO and a cervical traction unit pursuant to a prescription issued by PA Malik on June 14, 2023, when FV never treated with PA Malik on June 14, 2023.

(ix)     Insured RS was allegedly involved in a motor vehicle accident on June 16, 2023. Thereafter, RS sought treatment with S&R Medical at the Ocean Parkway Clinic. On August 24, 2023, EZ Ortho purportedly provided RS with cervical traction equipment pursuant to a prescription issued by Dr. Davidov on July 31, 2023, when RS never treated with Dr. Davidov on July 31, 2023.

(x)      Insured YB was allegedly involved in a motor vehicle accident on July 11, 2023. Thereafter, YB sought treatment with Dr. Lipnitsky at Triborough

Physical Therapy and Chiropractic PLLC ("Triborough PT") at the West End Avenue Clinic. On October 7, 2023 EZ Ortho purportedly provided YB with a custom fitted LSO billed under HCPCS L0631 and a cervical traction unit pursuant to a prescription issued by Dr. Lipnitsky on July 17, 2023, when YB never treated with Dr. Lipnitsky on July 17, 2023.

112.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were obtained as part of a predetermined fraudulent protocol, there were often significant delays between the date on which the prescription was issued and the date on which it was delivered to the Insured.

113.    For example:

(i)      Insured OA was allegedly involved in a motor vehicle accident on October 2, 2023. Thereafter, OA sought treatment with Dr. Lipnitsky at the West End Avenue Clinic. On October 9, 2023 Dr. Lipnitsky issued a prescription to OA for a "Pain Away Home Care Laser Device". Over two months later, on December 20, 2023, EZ Ortho purportedly provided a "Multi Radiance Medical Laser Device" to OA.

(ii)     Insured KI was allegedly involved in a motor vehicle accident on July 5, 2021. Thereafter, KI sought treatment with Dr. Watson at the Eastchester Road Clinic. On October 16, 2021 Dr. Watson issued a prescription to KI for "Cervical Traction". Two months later, on December 16, 2021, EZ Ortho purportedly provided a cervical traction unit to KI.

(iii)    Insured CP was allegedly involved in a motor vehicle accident on September 21, 2023. Thereafter, CP sought treatment with Dr. DiMaggio at the Seguine Avenue clinic. On November 1, 2023, Dr. DiMaggio issued a prescription to CP for a "Lumbar Sacral Orthosis", "Cervical Traction Equipment", and "pillow". Almost two months later, on December 23, 2023, EZ Ortho purportedly provided a custom fitted LSO, cervical traction unit, and general use wheelchair cushion to CP.

(iv)     Insured BM was allegedly involved in a motor vehicle accident on June 16, 2023. Thereafter, BM sought treatment with Dr. Davidov at the Ocean Parkway clinic. On July 31, 2023 Dr. Davidov issued a prescription to BM for a "cervical traction unit". Approximately a month and a half later, on September 11, 2023, EZ Ortho purportedly provided a cervical traction unit to BM.

(v)      Insured VG was allegedly involved in a motor vehicle accident on July 1, 2022. Thereafter, VG sought treatment with Dr. Watson at the clinic located at 3000 Eastchester Road, Bronx, NY (the "Eastchester Road Clinic"). On

August 24, 2022, Dr. Watson issued a prescription to VG for a "back brace". Approximately a month and a half later, on October 4, 2022, EZ Ortho purportedly provided a custom fitted LSO to VG.

(vi)    Insured BG was allegedly involved in a motor vehicle accident on May 9, 2022. Thereafter, BG sought treatment with PA Litovskiy at the Ralph Avenue Clinic. On June 29, 2022 PA Litovskiy issued a prescription to BG for "Cervical Traction". Approximately a month and a half later, on August 16, 2022, EZ Ortho purportedly provided a cervical traction unit to BG.

(vii)   Insured BG was allegedly involved in a motor vehicle accident on December 28, 2021. Thereafter, BG sought treatment with Dr. Watson at the Eastchester Road Clinic. On March 4, 2022, Dr. Watson issued a prescription to BG for "Cervical Traction" and a "Back Brace". Over one month later, on April 16, 2022, EZ Ortho purportedly provided a cervical traction unit to BG.

(viii)  Insured VL was allegedly involved in a motor vehicle accident on October 4, 2022. Thereafter, VL sought treatment with Dr. Lipnitsky at a no-fault clinic located at 35 West End Avenue, Suite C1, Brooklyn, NY (the "West End Avenue Clinic"). On October 10, 2022, Dr. Lipnitsky issued a prescription to VL for a "Lumbar Sacral Orthosis", and a separate prescription for a "Pain Away Home Care Laser Device". Over one month later, on November 13, 2022, EZ Ortho purportedly provided a custom fitted LSO and a "Multi Radiance Medical Laser Device" to VL.

(ix)    Insured FM was allegedly involved in a motor vehicle accident on September 12, 2023. Thereafter FM sought treatment with Dr. Davidov at a no-fault clinic located at the Ocean Parkway Clinic. On October 11, 2023, Dr. Davidov issued a prescription to FM for a "Cervical Traction Unit". One month later, on November 11, 2023, EZ Ortho purportedly provided a cervical traction unit to FM.

(x)     Insured DD was allegedly involved in a motor vehicle accident on May 16, 2022. Thereafter DD sought treatment with PA Litovskiy at a clinic located at 2277-83 Coney Island Avenue, Suite 2A, Brooklyn, NY (the "Coney Island Avenue Clinic"). On July 18, 2022, PA Litovskiy issued a prescription to DD for "Back Brace" and "Cervical Traction". Almost one month later, on August 10, 2022, EZ Ortho purportedly provided a cervical traction unit and custom fit LSO to DD.

114.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, the Defendants took affirmative steps to conceal the amount of

DME and OD being dispensed to individual Insureds through EZ Ortho.

115.    Specifically, at the behest of the John Doe Defendants, the Referring Providers would often issue prescriptions for multiple types of DME and OD on the same date. EZ Ortho would then submit a separate bill to GEICO for each separate prescription.

116.    For example:

(i)    An Insured named CP was allegedly involved in a motor vehicle accident on September 15, 2020. On December 4, 2020, CP received a checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---|---|---|
| CP | December 10, 2020 | E0855 Cervical Traction Equipment: $502.63 |
| CP | December 10, 2020 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(ii)    An Insured named FA was allegedly involved in a motor vehicle accident on November 29, 2021. Sometime thereafter, FA received an <u>undated</u> checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---|---|---|
| FA | January 1, 2023 | E0855 Cervical Traction Equipment: $502.63 |
| FA | January 1, 2023 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(iii)    An Insured named JR was allegedly involved in a motor vehicle accident on February 3, 2022. Sometime thereafter, JR received an <u>undated</u> checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---|---|---|
| JR | April 29, 2022 | E0855 Cervical Traction Equipment: $502.63 |
| JR | April 29, 2022 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(iv)    An Insured named HJ was allegedly involved in a motor vehicle accident on May 22, 2021. On August 3, 2021, HJ received checklist forms, purportedly issued by Dr. Watson, prescribing a "back brace" and "cervical traction." EZ Ortho then

submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---------|-----------------|------------------------------|
| HJ | August 26, 2021 | E0855 Cervical Traction Equipment: $502.63 |
| HJ | August 26, 2021 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(v) An Insured named DM was allegedly involved in a motor vehicle accident on September 23, 2021.  On November 9, 2021, DM received checklist forms, purportedly issued by Dr. Watson, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---------|-----------------|------------------------------|
| DM | November 29, 2021 | E0855 Cervical Traction Equipment: $502.63 |
| DM | November 29, 2021 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(vi) An Insured named MC was allegedly involved in a motor vehicle accident on January 5, 2022.  Sometime thereafter, MC received an <u>undated</u> checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---------|-----------------|------------------------------|
| MC | January 5, 2022 | E0855 Cervical Traction Equipment: $502.63 |
| MC | January 5, 2022 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(vii) An Insured named JM was allegedly involved in a motor vehicle accident on February 19, 2022.  Sometime thereafter, JM received an undated checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---------|-----------------|------------------------------|
| JM | April 19, 2022 | E0855 Cervical Traction Equipment: $502.63 |
| JM | April 19, 2022 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(viii) Insured JN was allegedly involved in a motor vehicle accident on April 1, 2021. Sometime thereafter, JN received an <u>undated</u> checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---|---|---|
| JN | May 17, 2022 | E0855 Cervical Traction Equipment: $502.63 |
| JN | May 17, 2022 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(ix)    Insured AE was allegedly involved in a motor vehicle accident on January 11, 2022. Sometime thereafter, AE received an <u>undated</u> checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---|---|---|
| AE | April 30, 2022 | E0855 Cervical Traction Equipment: $502.63 |
| AE | April 30, 2022 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

(x)    Insured SE was allegedly involved in a motor vehicle accident on November 19, 2021. Sometime thereafter, SE received an <u>undated</u> checklist form, purportedly issued by Dr. DiMaggio, prescribing a "back brace" and "cervical traction." EZ Ortho then submitted two separate bills to GEICO for these items:

| Patient | Date of Service | EZ Ortho's Charges to GEICO |
|---|---|---|
| SE | February 17, 2022 | E0855 Cervical Traction Equipment: $502.63 |
| SE | February 17, 2022 | L0631 LSO with AP Control Fitted/Adjusted: $806.64 |

117.    These are only representative examples.

118.    The Defendants coordinated the issuance of multiple prescriptions to the same Insured on the same date in an effort to conceal the amount of DME and OD they dispensed to individual Insureds because they knew that submitting one bill to GEICO for large amounts of DME and OD would likely arouse suspicion and draw attention to their fraudulent scheme.

119.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, at times prescriptions issued to a single insured by the same prescriber on the same date were delivered to the insured weeks, or even months, apart.

120.    For example:

(i)    Insured MA was allegedly in an automobile accident on December 13, 2021. On an unknown date MA received a prescription from Dr. DiMaggio for a "Back Brace" and "Cervical Traction". On June 11, 2022, EZ Ortho delivered a custom fit LSO to MA pursuant to the prescription ordered by Dr. DiMaggio. On July 24, 2022, over one month later, EZ Ortho delivered a cervical traction unit to MA pursuant to the prescription ordered by Dr. DiMaggio on an unknown date.

(ii)    Insured TM was allegedly in an automobile accident on April 1, 2022. On June 2, 2022 TM received prescriptions from PA Litovskiy for a "Back Brace" and "Cervical Traction." On June 13, 2022 EZ Ortho delivered a custom fit LSO to TM pursuant to the prescription ordered by PA Litovskiy on June 2, 2022. On July 31, 2022, over one month later, EZ Ortho delivered a cervical traction unit to TM pursuant to the prescription ordered by PA Litovskiy on June 2, 2022.

(iii)    Insured JV was allegedly in an automobile accident on April 2, 2022. On July 13, 2022 JV received a prescription from Dr. DiMaggio for "Lumbar Sacral Orthosis" and "Cervical Traction Equipment". On August 22, 2022, over one month later, EZ Ortho delivered a custom fit LSO to JV pursuant to the prescription ordered by Dr. DiMaggio. On November 26, 2022, over three months later and over four months after the prescriptions was issued, EZ Ortho delivered a cervical traction unit to JV pursuant to the prescription ordered by Dr. DiMaggio on July 13, 2022.

(iv)    Insured DC was allegedly in an automobile accident on April 26, 2022. On an unknown date, DC received a prescription from Dr. DiMaggio for "Lumbar Sacral Orthosis" and "Cervical Traction Equipment". On July 16, 2022, EZ Ortho dispensed a custom fit LSO to DC pursuant to the prescription ordered by Dr. DiMaggio. On July 31, 2022 EZ Ortho dispensed a cervical traction unit to DC pursuant to the prescription ordered by Dr. DiMaggio.

(v)    Insured AA was allegedly in an automobile accident on August 1, 2023. On August 2, 2023 AA received prescriptions from Dr. Lipnitsky for "Back Brace (LSO) L0648" and "Product Pain Away Home Care Laser Device". On August 16, 2023 EZ Ortho delivered a custom fit LSO to AA pursuant to the prescription ordered by Dr. Lipnitsky on August 2, 2023. On October 8, 2023, nearly two months later, EZ Ortho delivered a "Multi Radiance Medical Laser Device" to AA pursuant to the prescription ordered by Dr. Lipnitsky on August 2, 2023.

121.    These are only representative examples.

122.    In further keeping with the fact that the prescriptions for Fraudulent Equipment

identified in Exhibit "1" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, the prescriptions were typically not given to Insureds, but as part of the unlawful financial arrangements were routed directly to the DME Defendants by the John Doe Defendants.

123.    In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibit "1" were not medically necessary but were the result of a predetermined fraudulent protocol, the prescriptions at times contained vague and generic descriptions for DME and OD, so as to allow the DME Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO and other New York automobile insurers.

124.    In further keeping with the fact that the prescriptions purportedly issued by the Referring Providers were medically unnecessary, when the Insureds continued to seek treatment with the Referring Providers, the follow-up examination reports generated by the Referring Providers rarely, if ever, referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

125.    For the reasons set forth above, and below, in each of the claims identified in Exhibit "1", the DME Defendants falsely represented that the Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME and/or OD, and were therefore eligible to collect No-Fault Benefits in the first instance, when, in reality the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the DME Defendants pursuant to unlawful financial agreements.

**D.    The DME Defendants' Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed**

126.    As explained below, the bills submitted to GEICO by EZ Ortho misrepresented that the type of Fraudulent Equipment provided, to the extent any Fraudulent Equipment was provided, matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

127.    When the DME Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

128.    As indicated above, the applicable fee schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

129.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

130.    By submitting bills to GEICO containing specific HCPCS Codes, the DME Defendants represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

131.    However, in many of the claims for Fraudulent Equipment identified in Exhibit "1", when the DME Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

132.    As indicated above, it was part of the unlawful financial arrangements and predetermined protocols to allow the DME Defendants to maximize the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

133.    Accordingly, to the extent the prescriptions were actually authorized in the first place, the Clinic Controllers and Referring Providers purposefully provided prescriptions to the DME Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

134.    Based upon the vague and generic prescriptions that the DME Defendants received, the DME Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

135.    Although several options were available to the DME Defendants based upon the vague and generic prescriptions, the DME Defendants often billed GEICO – and likely other New York automobile insurers – using HCPCS Codes that contained one of the higher reimbursement amounts, and did so for their financial benefit.

136.    However, despite billing for Fraudulent Equipment using HCPCS Codes that had one of the higher reimbursement amounts, to the extent that the DME Defendants provided any of the Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO often severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

137.    For example, the DME Defendants submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for "custom fitted" pieces when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

138.    As identified in the claims contained within Exhibit "1", the DME Defendants often billed GEICO for Fraudulent Equipment that was purportedly customized for each Insured.  Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fitted" for

that individual patient.

139.    In order to help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

140.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification."  Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training.  For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

141.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements.  A certified orthotist is defined as an individual who is certified by the American

Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

142.    As shown in the claims identified within Exhibit "1", the DME Defendants often billed for Fraudulent Equipment that was purportedly "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fitted, as that term is defined by Palmetto.

143.    Based upon the prescriptions allegedly issued by the Referring Providers, the DME Defendants submitted numerous bills to GEICO for customized back braces under HCPCS Code L0631 which contained a charge for $806.64 and customized shoulder orthoses using HCPCS Code L3671 which contained a charge for between $690.23 and $1,380.46.

144.    The product assigned to HCPCS Code L0631 is a back brace that is customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by the DME Defendants.

145.    Similarly, the product assigned to HCPCS Code L3671 must be customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by the DME Defendants.

146.    Not only were these devices routinely not specifically designated in the prescriptions allegedly issued by the Referring Providers, but the "custom" back and shoulder braces purportedly sized and dispensed by the DME Defendants under HCPCS Codes L0631 and L3671 were not custom fitted by a certified fitter for each Insured.

147.    In keeping with the fact that the DME Defendants misrepresented that they custom-fitted the items billed under HCPCS code L0631 and L3671, upon information and belief, Zarbail is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

148.    Furthermore, the delivery person employed by EZ Ortho, who was typically responsible for "custom fitting" the orthotics dispensed by EZ Ortho was not a certified orthotist.

149.    Nevertheless, pursuant to the collusive arrangements between the DME Defendants, Clinic Controllers, and Referring Providers, the DME Defendants obtained prescriptions for generic lumbar supports so that they could unilaterally select what back brace to dispense and bill GEICO for a "custom" device rather than a more medically appropriate back support that has a lower maximum reimbursement amount.

150.    The DME Defendants' misrepresentations regarding Fee Schedule Items inflated the charges submitted to GEICO and resulted in EZ Ortho obtaining payment from GEICO under the New York "No-Fault" laws to which the DME Defendants were never entitled.

**E.    The Fraudulent Billing the DME Defendants Submitted or Caused to be Submitted to GEICO**

151.    To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of EZ Ortho, seeking payment for the Fraudulent Equipment.

152.    The NF-3 forms, HCFA-1500 forms, and treatment reports that the DME Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits.  In fact, the DME Defendants were

not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with the Clinic Controllers; (b) prescriptions that were issued pursuant to pre-determined protocols designed to maximize charges without regard for the medical necessity of the items; and (c) decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly represented to GEICO that the DME Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms.

**F.    The DME Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

153.    The DME Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

154.    To induce GEICO to promptly pay the charges for Fraudulent Equipment, the DME Defendants have gone to great lengths to systematically conceal their fraud.

155.    Specifically, the DME Defendants knowingly misrepresented and concealed facts related to the unlawful financial arrangements that formed the basis for the prescriptions for Fraudulent Equipment that were provided to the DME Defendants and ultimately used as the basis to submit bills to GEICO, in order to prevent GEICO from discovering that the DME Defendants unlawfully exchanged kickbacks for patient referrals and that the Fraudulent Equipment was billed to GEICO to maximize financial gain without regard to genuine patient care.

156.    Additionally, the DME Defendants knowingly misrepresented and concealed facts

in order to prevent GEICO from discovering that the prescriptions for Fraudulent Equipment were medically unnecessary and were issued pursuant to predetermined protocols, rather than to benefit the Insureds who supposedly received the Fraudulent Equipment.

157.    Furthermore, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

158.    In addition, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the DME Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds.

159.    Finally, the DME Defendants failed to appear at an examination under oath in compliance with the No-fault regulations and in response to GEICO's multiple requests for same.

160.    The billing and supporting documentation submitted by the DME Defendants, when viewed in isolation, did not reveal its fraudulent nature.

161.    The DME Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers.  These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full, even though EZ Ortho has failed and refused to cooperate with GEICO's requests that EZ Ortho appear for an examination under oath in accordance with the No-Fault Laws.

162.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent

litigation activity described above, were designed to, and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $254,000.00 based upon the fraudulent charges.

163.    Based upon the DME Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against EZ Ortho
### (Declaratory Judgment Under 28 U.S.C. § 2201)

164.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

165.    There is an actual case in controversy regarding more than $475,000.00 in fraudulent pending billing that has been submitted to GEICO in the name of EZ Ortho.

166.    EZ Ortho has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted, pursuant to predetermined protocols designed solely to financially enrich the DME Defendants and the Clinic Controllers, rather than to treat the Insureds.

167.    EZ Ortho has no right to receive payment for any pending bills submitted to GEICO because EZ Ortho provided Fraudulent Equipment as a result of its participation in unlawful financial arrangements.

168.    EZ Ortho no right to receive payment for any pending bills submitted to GEICO because – to the extent EZ Ortho actually provided any Fraudulent Equipment – EZ Ortho fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment

provided to the Insureds.

169.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that EZ Ortho have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Zarbail
### (Violation of RICO, 18 U.S.C. § 1962(c))

170.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

171.    EZ Ortho is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

172.    Zarbail knowingly conducted and/or participated, directly or indirectly, in the conduct of EZ Ortho's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for almost three years seeking payments that EZ Ortho was not eligible to receive under the New York No-Fault Laws because: (i) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to predetermined protocols designed solely to financially enrich the DME Defendants and the John Doe Defendants, including the Clinic Controllers, rather than to treat the Insureds; (ii) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to unlawful financial arrangements between the DME Defendants and the John Doe Defendants; and (iii) to the extent EZ Ortho actually provided any Fraudulent Equipment, EZ Ortho fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS

Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

173.    EZ Ortho's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Zarbail operates EZ Ortho, insofar as EZ Ortho is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for EZ Ortho to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Zarbail continues to submit and attempt collection on the fraudulent billing submitted by EZ Ortho to the present day.

174.    EZ Ortho is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by EZ Ortho in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

175.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $254,000.00 pursuant to the fraudulent bills submitted through EZ Ortho.

176.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Zarbail and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

177.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

178.    EZ Ortho is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

179.    Zarbail and John Doe Defendants 1-10 are owners of, employed by, or associated with the EZ Ortho enterprise.

180.    Zarbail and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of EZ Ortho's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for almost three years seeking payments that EZ Ortho was not eligible to receive under the New York No-Fault Laws because: (i) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to predetermined protocols designed solely to financially enrich the DME Defendants and the John Doe Defendants, including the Clinic Controllers, rather than to treat the Insureds; (ii) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to unlawful financial arrangements between the DME Defendants and the John Doe Defendants; and (iii) to the extent EZ Ortho actually provided any Fraudulent Equipment, EZ Ortho fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part,

in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

181.    Zarbail and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

182.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $254,000.00 pursuant to the fraudulent bills submitted through EZ Ortho.

183.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
### Against Zarbail and EZ Ortho
### (Common Law Fraud)

184.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

185.    EZ Ortho and Zarbail intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

186.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in

fact the prescriptions were provided pursuant to unlawful financial arrangements; and (iii) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

187.    Zarbail and EZ Ortho intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through EZ Ortho that were not compensable under the No-Fault Laws.

188.    GEICO has been injured in its business and property by reasons of the above-described conduct in that it has paid at least $254,000.00 pursuant to the fraudulent bills submitted by the DME Defendants through EZ Ortho.

189.    The DME Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

190.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against EZ Ortho and Zarbail**
**(Unjust Enrichment)**

191.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

192.    As set forth above, EZ Ortho and Zarbail engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

193.    When GEICO paid the bills and charges submitted by or on behalf of EZ Ortho

for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of EZ Ortho and Zarbail.

194.    EZ Ortho and Zarbail have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

195.    Retention of GEICO's payments by EZ Ortho and Zarbail violates fundamental principles of justice, equity, and good conscience.

196.    By reason of the above, EZ Ortho and Zarbail have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $254,000.00.

### JURY DEMAND

197.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgement be entered in their favor and against the Defendants as follows:

A.    On the First Cause of Action against EZ Ortho, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that EZ Ortho has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Zarbail, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $254,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Zarbail and the John Doe Defendants, more than $254,000.00 in compensatory damages, together with treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

   D.  On the Fourth Cause of Action against EZ Ortho and Zarbail, more than $254,000.00 in compensatory damages, punitive damages, plus costs and interest, and such other and further relief as this Court deems just and proper; and

   E.  On the Fifth Cause of Action against EZ Ortho and Zarbail, more than $254,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper.

Dated: October 18, 2024
   Uniondale, New York

          RIVKIN RADLER LLP

          By: */s/ Barry Levy*
            Michael A. Sirignano
            Barry I. Levy
            Michael Vanunu
            Joanna Rosenblatt
          926 RXR Plaza
          Uniondale, New York 11556
          (516) 357-3000

          *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*